

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| MARCELO MAILLAND, | § | No. 08-19-00063-CR |
| Appellant, | § | Appeal from the |
| v. | § | 41st Judicial District Court |
| STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20160D04232) |

## O P I N I O N

After Christian Jorjorian was found shot on a street in El Paso, a Grand Jury indicted Appellant, Marcelo Mailland, with capital murder. A jury found Appellant guilty of the lesser-included offense of murder, assessing his punishment at 45 years' imprisonment. On appeal, Appellant argues that the trial court erred by (1) denying his motion to suppress an interview that law enforcement obtained in violation of his Sixth Amendment right to counsel, (2) admitting a portion of that interview which mentions the co-defendant's claim that Appellant was the shooter, and (3) denying his request for two jury instructions. Because we conclude that the issues do not warrant relief, we affirm the trial court's judgment.

# I. BACKGROUND

On Monday, August 15, 2016, Appellant was spending the night at his parents' home in El Paso before he traveled the next day to Tucson, Arizona, to attend college. Appellant's "really close" family friend and peer, Marco Nava, asked Appellant if they could hang out that afternoon. Nava also began exchanging text messages with Christian Jorjorian at approximately 5:30 p.m. that day to arrange the purchase of two syringes of liquid tetrahydrocannabinol ("THC"), or "wax," later that evening. Appellant, driving his gray 2015 Nissan Rogue, picked up Nava, who texted Jorjorian as they approached a park on El Paso's westside of town. Jorjorian texted Nava back, at approximately 6:50 p.m. "get in [his] ride."

A witness playing basketball at the park recalled that at about 7 p.m., he heard a car pull up and yelling from within the car. Shortly thereafter, a car door opened, someone yelled, "I'm going to shoot you, n___! I'm going to shoot you." Then the car drove off.

A second witness driving in the area at approximately 6:30 p.m. recalled a small SUV roll through a stop sign, leaving rather quickly. The young driver of the SUV looked back towards the park as a passenger sat in the back seat. After this, the witness saw what looked like a mannequin sprawled out on the pavement behind a vehicle. As he approached, the witness realized the figure was a man who had blood on his shirt and was groaning. Two syringes filled with a greenish liquid laid next to the body. Responding EMS technicians were unable to revive the victim, identified as Christian Jorjorian. The coroner would later conclude that Jorjorian died from a gunshot wound to the chest. The bullet entered the chest cavity, perforating his lungs and heart.

One of Appellant's high school classmates had friends over that evening. Appellant arrived at this gathering at approximately 8 p.m. and behaved normally. Appellant had a small cut above

his eye, which he explained occurred while he was just fighting. Appellant's classmate understood this to mean that Appellant cut his face while practicing boxing.

The next day (Tuesday, August 16th), Appellant travelled to Tucson where he planned to attend the University of Arizona. On Thursday, August 18th, El Paso law enforcement arrested Nava for capital murder. Appellant learned of Nava's arrest that same day and called the El Paso Police Department asking to speak to a detective. Crimes Against Persons Detective Adrian Garcia returned the call, and Appellant told Detective Garcia that he wanted to speak to law enforcement, because he knew that Nava was under arrest and he was with Nava that "specific day." Appellant explained that he dropped Nava off at a park, drove off, heard a shot, but "didn't see nothing." When Detective Garcia proposed a meeting, Appellant indicated he was in Tucson, and agreed it would be "fine" to speak to a local Arizona detective. Detective Garcia thereafter provided Tucson Police Department Detective Orozco with Appellant's contact information so that the Tucson Police could set up a meeting.

Detective Orozco telephoned Appellant who agreed to meet. That same Thursday night, Appellant met with Tucson Homicide Detectives Orozco and Cheek in a hotel parking lot. Appellant arrived there with his aunt. Detective Cheek asked if Appellant wanted to relay information about the case. Appellant stated that he did, and Detective Cheek recorded the conversation. Appellant recited that on Monday Nava had called, asking if they could hang out on the afternoon of the murder. While driving around, Nava asked if Appellant could drop him off at a park because he needed to do something. Appellant asked Nava if he was going to buy drugs, which Nava denied. Appellant claimed he dropped Nava off around 5 p.m. and heard nothing until seeing on the news that there was a murder in the park around 8 p.m. that evening. Appellant met with Nava and some other friends the next morning who said goodbye before he left for Arizona.

3

Appellant learned his house was broken into that same day, and he suspected Nava was involved. The interview concluded with Appellant agreeing to speak with El Paso detectives if they came to Tucson.

After the interview concluded, Detective Orozco learned that Texas had issued an arrest warrant for Appellant. Tucson law enforcement thereafter arrested Appellant, impounded his Nissan, searched the aunt's vehicle and his dorm room. Detective Cheek discovered a handgun holster wedged between the rear passenger seat and cargo area of the aunt's car. In Appellant's dorm, law enforcement seized 14 unidentified prescription pills. While Tucson Police Department officers were taking photographs of Appellant at the station, Appellant spontaneously told an officer that the laceration on his forehead was caused by a car door. That same evening, the Tucson Police were dispatched to a local bowling alley after an employee found a handgun, two magazines, and a black cloth bag containing 99 rounds of ammunition in the women's restroom.

Appellant appeared in an Arizona Superior Court in Pima County on Friday morning, August 19th, for extradition proceedings related to a fugitive warrant. A bail issue was raised in the same hearing. The State of Arizona charged Appellant with being a fugitive from justice, in violation of an Arizona statute, and the Arizona Superior Court appointed the Legal Defender's Office to represent him during the extradition proceedings. Appellant ultimately waived extradition on August 25, 2016.

Tucson Detective Orozco informed El Paso Detective Garcia of the Thursday evening arrest and that Appellant wanted to speak to El Paso law enforcement. El Paso Detectives Garcia and Camacho arrived in Tucson at approximately 5 p.m. on Friday, August 19, 2016. The El Paso detectives met Appellant in a holding cell in the Pima County jail facility, introduced themselves as El Paso Police Department Crimes Against Persons detectives, and asked Appellant if he wanted

4

to speak to them. Appellant responded that he did. Detective Garcia read Appellant his *Miranda* rights, which Appellant waived, including his right to counsel. Detective Garcia later testified that he did not know about the earlier extradition hearing or that the Arizona state court appointed the Pima County Legal Defender's Office to represent Appellant for the extradition proceedings.

During the recorded interview, Appellant relayed several versions of what occurred at the time Jorjorian was killed. His initial versions minimized his involvement in the murder, but as he was confronted with additional information, he finally admitted this much: Appellant drove Nava to the park and that Nava shot Jorjorian. Appellant also ultimately admitted that he and Nava planned to rob Jorjorian, both he and Nava hit Jorjorian, and Nava used Appellant's firearm to shoot Jorjorian. Appellant disposed of that gun in a Tucson bowling alley. At trial, the State played a DVD recording of the interview for the jury over trial counsel's objection. Also over trial counsel's objection, the State offered a transcript of the video.

The jury was charged on capital murder and three lesser included offenses: murder, aggravated robbery, and robbery. The jury returned a general verdict finding Appellant guilty of the lesser-included offense of murder. In the jury charge, the trial court instructed the jury that capital murder and murder both meant (1) Appellant caused Jorjorian's death by "shooting Christian Jorjorian with a firearm" while committing or attempting to commit "robbery;" (2) soliciting or attempting to aid Nava to commit robbery, and in the furtherance of the robbery, Nava shot Jorjorian with a firearm causing his death; or (3) while attempting to carry out a conspiracy to commit robbery with Nava, and in furtherance of that purpose, Nava shot Jorjorian, causing his death. Under the charge, capital murder required a finding that the relevant actor "intentionally" caused the death, while the lesser murder charge required a finding that the actor "committed an act clearly dangerous to human life[.]"

5

## II. ISSUES ON APPEAL

Appellant argues that the trial court erred by (1) failing to suppress the interview that law enforcement obtained in violation of his Sixth Amendment right to counsel, (2) refusing to excise out of the interview statements purportedly attributable to Nava, and denying his requests for jury instructions on the (3) lesser included offense of manslaughter, and (4) corpus delicti. We address each issue in turn.

## III. NO SIXTH AMENDMENT ERROR

Appellant first argues that the trial court erred by denying his motion to suppress the statement he provided to El Paso detectives while he was in an Arizona detention facility awaiting extradition proceedings. Specifically, Appellant maintains his right to counsel on the Texas capital murder charge attached when he appeared with counsel in Arizona state court on Friday morning, and the El Paso detectives violated this Sixth Amendment right when they interviewed him without his Arizona attorney's consent on Friday afternoon.

### A. Pretrial Motion to Suppress the Interview

Appellant moved to suppress the statement provided to El Paso detectives through a pretrial motion. Appellant did not contest that El Paso detectives advised him of his *Miranda* rights at the onset of the interview and that he waived his right to counsel. Rather, he maintained that the waiver of rights was invalid, because he was already represented by Arizona counsel at the time the waiver was obtained.

The State responded to the motion, arguing that the interview did not violate Appellant's Sixth Amendment rights because: (1) his formal prosecution for capital murder in Texas had not commenced; (2) Arizona state court extradition proceedings did not trigger a Texas criminal defendant's Sixth Amendment right to counsel; (3) because the right to counsel is offense specific,

6

and Appellant's Arizona counsel represented him only on fugitive complaint and extradition proceedings; and (4) Appellant's waiver of counsel at the onset of the interview was valid, whether or not he had counsel at the time.

After a pretrial hearing, the trial court denied the motion to suppress, and later entered findings of fact and conclusions of law. Neither party takes issue with those findings of fact, which in relevant part conclude: (1) Appellant was arrested on a "Fugitive from Justice" complaint stemming from an outstanding capital murder arrest warrant from El Paso, Texas; (2) on the morning of August 19, Appellant made a preliminary appearance at a bond hearing, at which time counsel was appointed; (3) there was no evidence that Appellant requested the appointment of counsel; (4) later that day, El Paso Police detectives met with the Appellant in the Pima County Jail; (5) at the time of that meeting, Appellant had not yet been formally charged by indictment in the State of Texas; (6) the detectives did not request nor receive permission from Appellant's Pima County court-appointed attorney before they spoke to Appellant; and (7) the detective did explain to Appellant before the interview began his constitutional rights pursuant to *Miranda*, Appellant acknowledged that he understood those rights, and that he waived his right to remain silent and his right to have an attorney present.

The trial court made also reached the following relevant conclusions of law:

1. Defendant voluntarily waived his 6th amendment constitutional right to counsel during his El Paso police interview on August 19, [2016].
. . .
3. The State of Arizona, as the asylum state in the extradition proceedings, could not conduct a preliminary inquiry or determination regarding the guilt or non-guilt of the charges the Defendant could be facing in Texas.

4. The right to counsel did not attach at the Arizona extradition bond hearing because the Defendant had not been formally charged in Texas.

7

5.  The El Paso detectives that interviewed the Defendant on August 19, 2016 were not required to request permission to approach the Defendant to interview him in the jail.

6.  The El Paso detectives that interviewed the Defendant on August 19, 2016 did not violate the Defendant's 6th amendment right to counsel.

## B.  Standard of Review

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard.  *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex.Crim.App. 2020).  A trial court's findings of historical fact are afforded almost total deference if they are reasonably supported by the record.  *See id.*, *citing Sims v. State*, 569 S.W.3d 634, 640 (Tex.Crim.App. 2019).  A trial court's determination of legal questions and its application of law to facts that do not turn upon a question of witness credibility are reviewed de novo.  *See id.*  An appellate court will sustain the trial court's ruling if it is correct under any applicable theory of law that the record reasonably supports.  *See id.*, *citing State v. Ruiz*, 581 S.W.3d 782, 785 (Tex.Crim.App. 2019).

Appellant does not dispute the trial court's factual findings.  He argues only that the trial court incorrectly concluded that his Sixth Amendment right to counsel for the Texas capital murder charge did not attach when he appeared in the Arizona Superior Court in Pima County the morning of August 19, 2016.  He maintains that he was arrested on the Texas capital murder warrant, and his extradition was not a separate "offense" for Sixth Amendment purposes.

## C.  Controlling Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. CONST., amend VI.  The right to counsel "attaches" with the initiation of adversarial judicial proceedings, which may be by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Brewer v. Williams*, 430 U.S. 387, 398 (1977).  And once the adversarial judicial process has been initiated,

8

the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *Maine v. Moulton*, 474 U.S. 159, 169 (1985); *Green v. State*, 872 S.W.2d 717, 719 (Tex.Crim.App. 1994).

The Supreme Court has repeatedly held that the Sixth Amendment right to counsel is offense specific. *See, e.g.*, *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *Moulton*, 474 U.S. at 180. In *Moran v. Burbine*, for instance, after the defendant was arrested on breaking and entering charges, he refused to waive his *Miranda* rights or speak to law enforcement. 475 U.S. 412, 415-16 (1986). Unknown to the defendant, a public defender was assigned to his case, who telephoned the police station and stated that the defendant was "represented by [an] attorney" . . . "in the event that the police intended to place him in a lineup or question him." *See id.* at 415-16. The lawyer was told that law enforcement would not question the defendant until the following day. *See id.* at 416. But less than an hour later, law enforcement brought the defendant into an interrogation room and conducted the first of three interviews concerning a *different investigation*--one for a murder in a nearby community. *See id.* at 417. And for those interviews, the defendant waived his *Miranda* rights and confessed to the murder. *See id.* at 417-18.

After rejecting the defendant's Fifth Amendment arguments, the Court held that the officers did not violate his Sixth Amendment right to counsel because law enforcement interrogated him before his right to counsel attached for the murder charge. *See id.* at 430. The Court rejected the argument that the Sixth Amendment protects the integrity of the attorney-client relationship regardless of whether prosecution has commenced through indictment. *See id.* The Court also rejected the argument that custodial interrogations were of such great consequence that they required a special rule. *See id.* at 432. In addition, the suggestion that the existence of an attorney-client relationship, alone, triggered a Sixth Amendment right misconceived the purpose

of the right to counsel. *See id.* at 430. The Sixth Amendment's function is not "to wrap a protective cloak around the attorney-client relationship for its own sake" or to "protect a suspect from the consequences of his own candor." *Id.* The purpose of the right is to assure that in a criminal prosecution, "the accused shall not be left to his own devices in facing the prosecutorial forces of organized society," and "to assure that the prosecution's case encounters the crucible of meaningful adversarial testing." *Id.* (internal quotes omitted).

In the past, the Court had also held that once an accused requested the assistance of counsel based on the Sixth Amendment, the police could not initiate any questioning or attempt to induce a waiver of the right to counsel. *Michigan v. Jackson*, 475 U.S. 625, 635-636 (1986). Under that bright line rule, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* at 636. The Court abandoned this approach, however, in *Montejo v. Louisiana*, 556 U.S. 778 (2009). Factually, the defendant in *Montejo* was appointed counsel at a preliminary hearing. *Id.* at 780. The police, unaware that counsel had been appointed for Montejo, and after reading him his Miranda rights, persuaded him to accompany them to help locate the murder weapon. At that time, Montejo wrote an inculpatory letter of apology to the victim's widow, which was admitted at trial. *Id.* at 782. On appeal, he claimed that under *Jackson*, the appointment of counsel at an arraignment should be treated as an invocation of the Sixth Amendment right to counsel at every subsequent critical stage in the prosecution.

The Court rejected that approach, however, noting that "it would be completely unjustified to presume that a defendant's consent to police-initiated interrogation was involuntary or coerced simply because [the defendant] had previously been appointed a lawyer." *Id.* at 792. Instead, once the right to counsel has attached, "a defendant who does not want to speak to the police without

10

counsel present need only say as much when he is first approached and given the *Miranda* warnings." *Id*. at 794. "At that point, not only must the immediate contact end, but any 'badgering' by later requests is prohibited." *Id.* at 787. The Court reached this conclusion based on the marginal benefits of a *Jackson* bright-line rule, balanced against hindering "society's compelling interest in finding, convicting, and punishing those who violate the law." *Id*. at 793. Additionally, the Court noted the "substantial other, overlapping measures to exclude them." *Id.* at 794, *citing Miranda v. Arizona*, 384 U.S. 436, 473-74, (1966) (requirement to inform suspect of the right to counsel); *Edwards v. Arizona*, 451 U.S. 477, 484-85, (1981) (once counsel is requested, suspect is not subject to further interrogation unless he or she initiates the same); *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990) (no subsequent interrogation may take place until counsel is present, "whether or not the accused has consulted with his attorney.").

Therefore, a court can no longer presume that a waiver of a right to counsel executed after the right to counsel has attached is invalid. An accused must make a clear assertion of the right to counsel when officers initiate interrogation and in that case no interrogation should take place. A subsequent waiver would be invalid if it follows an unequivocal election of the right to counsel. *Montejo*, 556 U.S. at 797; *Pecina v. State*, 361 S.W.3d 68, 78 (Tex.Crim.App. 2012) ("Distilled to its essence, *Montejo* means that a defendant's invocation of his right to counsel at his [Texas Code of Criminal Procedure] Article 15.17 hearing says nothing about his possible invocation of his right to counsel during later police-initiated custodial interrogation.").

**D. Application**

From these cases, the parties first argue over whether the right to counsel attached at the extradition proceeding, such that it would extend to Appellant's questioning later that afternoon on the murder investigation. The extradition proceeding is necessarily limited and would not turn

on Appellant's guilt on the murder charge. *See Rogers v. Boies*, 478 P.2d 92, 93 (Ariz. 1970) (en banc) (providing that "the sufficiency of the information charging the offense must be tested in the demanding state"). Rather, Appellant's extradition attorney could have civilly challenged only whether (1) the extradition documents were in order; (2) Appellant was charged with a crime in Texas; (3) Appellant was the person named in the request for extradition; and (4) Appellant was a fugitive, meaning he left Texas for Arizona.[1] *See California v. Superior Court of California, San Bernardino County*, 482 U.S. 400, 409 (1987); *Applications of Oppenheimer*, 389 P.2d 696, 700 (Ariz. 1964) (en banc). And in *Texas v. Cobb*, the Supreme Court reiterated that it "meant what it said" when it held that the Sixth Amendment right to counsel was offense specific and does not extend to crimes "closely related factually" to the charged offense. 532 U.S. 162, 165 (2001), *citing McNeil*, 501 U.S. 171.

But we need not reach the issue of whether the right to counsel for the Texas murder charge attached at the time of the Arizona extradition proceeding, because even if the right to counsel attached, Appellant freely and voluntarily spoke with the El Paso detectives, never mentioning his extradition counsel, nor invoking the right to counsel. One of our own cases makes that point. In *Flores v. State*, 299 S.W.3d 843 (Tex.App.--El Paso 2009, pet. ref'd), the defendant committed a murder in El Paso and fled to Mexico. He was extradited from Mexico back to Texas and had counsel for that extradition proceeding. Upon his return to Texas, detectives advised the defendant of his *Miranda* rights, and after waving those rights, he gave a full confession of the crime.

As in this case, the defendant in *Flores* claimed the assignment of counsel at the extradition proceeding automatically precluded any questioning by the police unless counsel was present. *Id*.

---

[1] ARIZ.REV.STAT.ANN. § 13-3845 (2017) (indicating that a warrant of execution shall issue if the accused "fled from the state"). For instance, Appellant's Arizona attorney could have filed a civil petition for writ of habeas corpus that argued the warrant of extradition did not comply with Arizona law because the fingerprints or photograph identifying Appellant in the Texas complaint were not made on a proper affidavit. *See* ARIZ.REV.STAT.ANN. § 13-3845(B) (2017).

at 852. Noting the change in the law following *Montejo*, this Court rejected that argument, instead looking to voluntariness of the Sixth Amendment waiver. *Id.* Noting that there was no evidence in the record that Flores was "coerced, badgered, or tricked" into waiving his right to counsel, we upheld the denial of a suppression motion for the confession.

The record here reads similar to that in *Flores*. First the obvious. In both cases the police interviewed the accused after counsel had been appointed for extradition proceedings. And as in *Flores*, the interview here began with the detective advising Appellant of his *Miranda* rights, including his right to counsel, and Appellant agreed that he understood and voluntarily waived his rights. Similarly, Appellant does not contest the trial court's finding that he voluntarily waived his *Miranda* rights, including his Sixth Amendment right to counsel, during his interview with the El Paso detectives. He did not tell the detectives he already had counsel, and it was Appellant who first actively reached out to the detectives to initiate an interview (and then later confirmed with the Tucson police that he would speak with the El Paso detectives). Under *Montejo*, even if a Sixth Amendment right to counsel had attached to his Texas capital murder charge at the time of the interview, Appellant validly waived the right. *See Montejo*, 556 U.S. at 792-94*; Patterson v. Illinois*, 487 U.S. 285, 290 (1988) (concluding that law enforcement are not barred from initiating a meeting with a post-indictment defendant who does not exercise his right to have counsel present).

Appellant responds that the extradition in *Flores* was complete, and the detectives in that case would not have any way to even learn of the identity of the Mexican counsel. While these are distinctions, they are without a meaningful difference. The essence of Appellant's argument is that because the extradition in Arizona was still active, we must assume Appellant requested counsel, which acts as a bar to any knowing waiver of the right to counsel. *See Edwards*, 451 U.S.

13

at 484-85 (once counsel is requested, suspect is not subject to further interrogation unless he or she initiates the same). This claim, however, sounds much like the bright-line rule, or at least the presumption, that the Court rejected in *Montejo*. Moreover, the trial court here expressly found that there was no evidence that Appellant had ever requested the appointed counsel for the extradition hearing. Finding no meaningful distinction between this case, and *Flores*, we overrule Issue One.[2]

## IV. NO BRUTON OR CONFRONTATION ERROR

Appellant next argues that the trial court erred by declining to redact that part of the interview where the detectives confronted Appellant with Nava's claim that Appellant was the shooter. Appellant presented this as a *Bruton*[3] error, that also implicated his Sixth Amendment right to confrontation. The State responds that that *Bruton* was not implicated at Appellant's trial, and the trial court did not violate Appellant's confrontation rights, because the statements were not offered for their truth. We agree with the State and conclude that the issue does not warrant relief.

### A. Appellant's Interview with El Paso Detectives

During his interview with the El Paso detectives, Appellant provided several versions of what occurred on the night that Jorjorian was killed that changed as the detective tested and confronted his story. He first claimed that Nava asked Appellant to drop him off at the park on Monday night. Appellant drove off after Nava exited the vehicle. Appellant heard a bang as he drove away, but continued on to his friend's house. Appellant stated that he did not "see anything, but [he] heard the bang."

---

[2] Appellant correctly points out that the *Flores* court also buttressed its decision by concluding that any error in admitting that confession was harmless error. Nonetheless, the court did reach the merits of the violation itself.

[3] *Bruton v. United States*, 391 U.S. 123 (1968)

But then the detectives began breaking down his story with a series of techniques, including telling Appellant that "[w]e live in a world nowadays where nothing goes unseen," that residences in the neighborhood where the murder occurred likely had security cameras, that Appellant needed to be honest, and that DNA evidence might indicate who struck who. Germane to Appellant's complaint here, the detectives also confronted Appellant with what Nava claimed:

Detective Garcia: We know the truth, Okay? And Marco [Nava] did get arrested.

Appellant: Okay.

Detective Garcia: Okay?

Appellant: (Nodding.)

Detective Garcia: Last night.

Appellant: Okay.

Detective Garcia: He told us everything.

Appellant: Okay.

Detective Garcia: All right?

Appellant: I'm telling you everything I know.

Detective Garcia: If you want to go down for this on your own, that's your choice, okay? He's saying it's you.

Appellant: I did not shoot anyone.

Detective Garcia: I'm just --

Appellant: I know.

Detective Garcia: He's saying it's you.

Appellant: I'm sure. I'm sure.

Detective Garcia: You're saying it's him.

The interview continued:

15

Detective Garcia: He's [Nava] saying he saw you.

Appellant: No. I did not kill anyone. I did not shoot anyone.

By the end of the interview, and after having offered different versions of what happened, Appellant eventually admitted that he and Nava were at the park to steal drugs from Jorjorian. After Jorjorian got into the front seat of Appellant's parked car, Nava (who was seated in the rear seat) and Appellant both hit Jorjorian. Jorjorian ducked and got out of the vehicle, and Nava followed. Nava shot the gun and got back into Appellant's car. Appellant drove Nava home, and continued to his friend's house. Nava kept the shell casing ejected from the gun. Appellant also admitted that his gun--a black Glock .38--was used to shoot Jorjorian. Appellant informed the detectives that he threw the firearm away by a bowling alley in Tucson.

## B. Pretrial Hearings

Prior to trial, Appellant filed a motion in limine to preclude any reference to what he El Paso detectives claimed that Nava told law enforcement about the murder. Appellant urged that the trial court would violate his federal confrontation rights and cited to *Bruton v. United States*. During a hearing on the motion, the State proposed that the trial court provide a limiting jury instruction that law enforcement's statements to Appellant concerning Nava were not presented for their truth, but for evaluating Appellant's response, and that officers may use deception during interviews.[4] The trial court deferred ruling on the motion.

Before the State played the video of Appellant's interview at trial, it re-asserted that any reference to a purported statement by Nava was offered to show: (1) why law enforcement investigated Appellant (i.e. how Appellant became a suspect and was interviewed) and (2)

---

[4] The State noted that law enforcement told Appellant during the interview that surveillance cameras captured the shooting, which was not true.

16

Appellant's reaction after law enforcement revealed that they knew information about the murder. Appellant's counsel responded that she could not cross-examine Nava's purported statement that "Marcelo did it." The trial court admitted the video without redaction, noting that the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter.

## C. Trial Proceedings

The State's theory of the case was not that Appellant necessarily shot Jorjorian. Rather, the State based its case on the law of parties. In opening statement, the State admitted that the evidence would not conclusively demonstrate that Appellant shot Jorjorian. Instead, the State said: "We don't know. We don't know which one of them actually pulled the trigger that killed Christian Jorjorian." The State suggested that Nava arranged the robbery, while Appellant helped plan the robbery and assisted through use of his car and loaded gun.[5] After both Appellant and Nava assaulted Jorjorian, "the defendants got a gun, pointed it at him, and shot him once in the chest."

Appellant's counsel responded during her opening statement that: (1) law enforcement had not properly investigated the murder at the time they interviewed Appellant; and (2) during the interview, detectives psychologically manipulated Appellant into reciting the information they wanted to hear. Counsel told the jury "you'll get to see this video," where law enforcement "push" and "prod" Appellant until he provides a statement to "please them[.]" Counsel told the jury that they "will see . . . that that interview is a study in how to manipulate a confession out of somebody," a "study in psychological manipulation."

---

[5] The State asked the jury to "keep this in mind, how does Marco Nava get [Appellant's] gun before it happens? And how does Marco Nava return his gun to him before he goes to college?" The State followed in the next sentence by arguing that "[w]ithout a doubt, the evidence is going to prove to you that [Appellant] was an accomplice; that he was a party to capital murder."

When the State played the DVD recording of Appellant's interview with El Paso detectives, the trial court overruled counsel's renewed objections to the evidence.

### D. Limiting Instruction

After the defense rested, the trial court instructed the jury:

> During the presentation of evidence, references were made to statements made by Marco Nava. However, these statements were not admitted as evidence to show what he purportedly said was true. You are instructed that you may not rely or consider these statements as evidence of guilt of the [d]efendant.

During closing argument, Appellant's counsel reminded the jury of the instruction that it may not consider a statement that Nava may or may not have made as evidence of Appellant's guilt. Counsel cautioned that the jury may not speculate about what Nava might have told law enforcement, and the only evidence presented in the DVD recording of Appellant's interview were Appellant's words.

### E. No *Bruton* Violation

In *Bruton v. United States*, the Supreme Court held that, at a joint trial of a defendant and his co-defendant, a defendant's confrontation rights are violated if the government presents a statement made by the co-defendant implicating the other defendant when the co-defendant does not testify (and therefore is not subject to cross-examination). 391 U.S. 123, 136 (1968) (also holding that a limiting jury instruction does not cure the error). Strictly speaking, *Bruton* is not applicable to this appeal. Appellant and Nava were not co-defendants tried jointly. We thus overrule Appellant's issue to the extent that he alleges a *Bruton* violation. Appellant, however, clarifies that the phrase "*Bruton* violation" was used as a shorthand below for a Confrontation Clause violation, which we address next.

**F. No Violation of Confrontation Rights**

Appellant separately argues that the trial court violated his general confrontation rights by admitting the statement, when he had no opportunity to cross-examine Nava.

*1. Controlling law*

The Sixth Amendment's Confrontation Clause provides the accused in criminal prosecutions "the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Clause was included in our Constitution to address the practice in England of reading in court in lieu of live testimony the pretrial examinations of suspects and statements of government officials. *See Crawford v. Washington*, 541 U.S. 36, 43 (2004). "The principal evil at which the [Confrontation] Clause was directed was the civil-law mode of criminal procedure, [and] particularly the use of *ex parte* examinations as evidence against the accused." *Id.* at 50. The Confrontation Clause accordingly prohibits the introduction of testimonial statements of a non-testifying witness unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him. *See id.* at 59.

But only "testimonial statements" cause a declarant to be a "witness" under the Confrontation Clause. *Davis v. Washington*, 547 U.S. 813, 820 (2006). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id.* To distinguish testimonial statements from those that are not, courts look to the "primary purpose" of the statement. So, for instance, when the State seeks to admit a 911 recording (which contains the out of court statement of the person making the call), the primary purpose for many of the 911 operator's questions is to respond to an "ongoing emergency," and not to create a record for trial. *Id.* at 822. Because those kind of questions and answers would not be testimonial, they do not

implicate the Confrontation Clause. *Id.* Similarly, a police officer might recount the dying declaration of a victim if the statement was elicited to assist the police to meet an ongoing emergency. *Michigan v. Bryant*, 562 U.S. 344, 358-59 (2011). But conversely, "[s]tatements taken by police officers in the course of interrogations," would always qualify as testimonial statements. *Crawford*, 541 U.S. at 53 (a "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." ). To decide whether a statement is testimonial, "standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Bryant*, 562 U.S. at 358-359. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015), *quoting Bryant*, 562 U.S. at 358.

An appellate court determines de novo whether a statement is testimonial or non-testimonial. *See Wall v. State*, 184 S.W.3d 730, 742 (Tex.Crim.App. 2006), *citing Lilly v. Virginia*, 527 U.S. 116 (1999).

### 2. Application

The rub here is that the State used the supposed product of an interrogation of one defendant to confront another defendant's version of events. We conclude that the primary purpose of repeating Nava's supposed statement was not as an out-of-court substitute for trial testimony, but rather it was part of the process of interrogation of Appellant to test his claimed version of events.

Appellant himself raised the issue of the propriety of the interview, claiming that he was "psychologically manipulated" into repeating desired language during the interview. He also challenged the adequacy of the detectives' investigation at the time of the interview. Even assuming that Nava provided a testimonial custodial statement, the trial court did not violate

20

Appellant's confrontation rights because the statements were admitted not for the truth of the matter asserted, but rather to show (1) why law enforcement investigated Appellant; and (2) Appellant's reaction after detectives revealed they knew information about the murder.

At least two prior decisions of higher courts tell us that a statement offered not for the truth of the matter asserted does not implicate the Confrontation Clause. In *Del Carmen Hernandez v. State*, the Court of Criminal Appeals concluded that testimonial statements from a co-defendant's custodial interrogation were properly admitted for impeachment purposes and not to prove the truth that Appellant committed the crime. *See* 273 S.W.3d 685, 689 (Tex.Crim.App. 2008). During a trial for capital murder, inmate witnesses testified that Appellant's co-defendant talked to them and took responsibility for the murder. *See id.* at 687. On rebuttal, the State called a detective to read portions of the unavailable co-defendant's custodial statement in which she denied involvement in the homicide. *See id.* The trial court admitted the testimony over trial counsel's objection on confrontation grounds and provided a limiting instruction. *See id.*

The Court of Criminal Appeals explained the testimonial custodial interrogation of a co-accused was used for a non-hearsay purpose--impeaching credibility. *See id.* at 688. The defendant placed the credibility of her co-defendant at issue when she called inmate witnesses to testify to prior statements the co-defendant made. *See id.* at 689. The court noted that the trial court provided a limiting instruction, and the State did not refer to the statement as substantive evidence during argument. *See id.* The *Del Carmen Hernandez* decision relied upon Supreme Court authority indicating that "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *See id.*, *citing Crawford*, 541 U.S. at 59 n.9.

21

Specifically, in *Tennessee v. Street*, the defendant in a murder trial claimed that his confession was coerced, because law enforcement read him an accomplice's statements and directed him to "say the same thing."[6] 471 U.S. 409, 411 (1985). The State called the sheriff to read the accomplice's statement to rebut Street's claim and demonstrate the inconsistencies between the statements. *See id.* at 411-412. The trial court admitted the statement and provided a limiting instruction. *See id.* at 412. The Court determined that the State did not introduce the confession to prove the truth of its content, but rather to rebut Street's testimony that his confession was coerced, and the evidence was not hearsay. *See id.* at 413 (noting the case was "significantly" different than the Court's prior confrontation cases where the trial court admitted hearsay as substantive evidence against the defendant). The non-hearsay aspect of the confession--the admission to prove what happened when respondent confessed--raised no Confrontation Clause concerns. *See id.* at 414. The Court emphasized that the State's most important piece of substantive evidence was respondent's confession. *See id.* at 415. After respondent testified that his confession was a coerced imitation, the focus turned to the State to rebut the claim. *See id.* If the State was denied the opportunity to present the accomplice's testimony in rebuttal, the jury would have been impeded in evaluating the truth and "handicapped in weighing the reliability of the confession." *Id.* The Court found this result at odds with the mission of the Confrontation Clause--"to advance the accuracy of the truth-determining process in criminal trials." *See id.*, *citing Dutton v. Evans*, 400 U.S. 74, 89 (1970).

As in *Street*, during Appellant's trial, the State needed to address Appellant's claim to the jury that El Paso detectives "had their minds made up before they ever spoke to" Appellant, so they "manipulate[ed] a confession" out of him. Thus, the trial court properly admitted the evidence

---

[6] Although *Tennessee v. Street* pre-dates *Crawford v. Washington*, the decision was cited with approval in *Crawford*. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004), *citing Tennessee v. Street*, 471 U.S. 409, 414 (1985).

to show how law enforcement came to suspect and interview Appellant. *See id.* at 414. The State also needed to show how Appellant's story of events morphed from he did not "see anything" to the point of confessing to most details of the crime. The several challenges that the detectives used to break down Appellant's story form a part the fabric of that process.[7]

We also find additional factors significant here. The State's case never hinged on who shot Jorjorian. Accordingly, the instruction that the jury should consider the truth of Nava's statement fit hand-in-glove with the State's theory of the case that Appellant could be guilty even if Nava pulled the trigger. Nor did the State cite to this portion of the interview during opening statement or closing argument, and the trial court provided a limited instruction that trial counsel emphasized during closing argument. *See Luquis v. State*, 72 S.W.3d 355, 366-67 (Tex.Crim.App. 2002) (noting that appellate courts presume the jury followed instructions and will not find constitutional error unless a reviewing court concludes that a reasonable jury was actually confused by the charge). Moreover, cross-examination of Nava would be ineffective to undermine how the State was using the statement. *See Street*, 471 U.S. at 414 (noting that confrontation rights were not implicated, in part, because cross-examination of respondent's accomplice would be ineffective to undermine the limited purpose of demonstrating that Appellant's confession was not coerced).

As such, we conclude that the trial court did not err by denying Appellant's motion to preclude the portion of the interview containing Nava's purported statements. We overrule Issue Two.

---

[7] The State's ability to rebut trial counsel's allegations of "psychological manipulation" was a focus of trial because the jury was instructed that it could only consider Appellant's confession if each juror agreed that the State proved, beyond a reasonable doubt, that Appellant made the statement freely and voluntarily.

## V. No Error for Failing to Provide Manslaughter Instruction

In his third issue, Appellant argues that the trial court erred when it failed to instruct the jury on the lesser included crime of manslaughter. Appellant maintains that a jury could have found him guilty of manslaughter based on the evidence that he had a gun in his back seat that was accessible to Nava. The State responds that the record would not support a finding that Appellant committed reckless conduct that caused the actual shooting of the firearm that killed Jorjorian. We agree and conclude that the issue does not warrant relief.

### A. Controlling Law

Texas employs a two-part analysis to determine whether a defendant is entitled to an instruction on a lesser-included offense. *See Roy v. State*, 509 S.W.3d 315, 317 (Tex.Crim.App. 2017). The court first determines whether the offense in the requested instruction is a lesser-included offense of that charged in the indictment. *See id.* If so, the court decides whether a jury could rationally find that, if the defendant is guilty, he is guilty of only the lesser-included offense, based on the admitted evidence. *See id.*

We do not address the first prong of the analysis here, because the State and Appellant agree that the first prong is satisfied. As to the second element, an instruction on a lesser-included offense is required only if more than a scintilla of evidence establishes that "the lesser-included offense is a valid, rational alternative to the charged offense." *Id.* at 317, *quoting Goad v. State*, 354 S.W.3d 443, 446 (Tex.Crim.App. 2011). Although little evidence is needed to warrant an instruction, the relevant evidence must affirmatively "raise[ ] the lesser included offense and rebut[ ] or negate[ ] an element of the greater offense." *Roy*, 509 S.W.3d at 317, *quoting Cavazos v. State*, 382 S.W.3d 377, 385 (Tex.Crim.App. 2012).

A person commits the offense of manslaughter by recklessly causing the death of an individual. TEX.PENAL CODE ANN. § 19.04(a). A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. TEX.PENAL CODE ANN. § 6.03(c). Even assuming that manslaughter is a lesser included offense of capital murder as charged in Appellant's indictment, we perceive two problems with Appellant's claim. First, the conduct that he claims shows recklessness is not the same conduct that caused the death of Jorjorian. Second, the record is lacking in the evidence of recklessness upon which Appellant's argument is based.

**B. The Claimed Recklessness was not the Conduct that Caused the Death**

The culpable mental states for both murder and manslaughter relate to the result of the conduct--the causing of the death. *See Schroeder v. State*, 123 S.W.3d 398, 399 (Tex.Crim.App. 2003) (en banc). To commit manslaughter, a person must recklessly cause the death of another. *See id.*, *citing* TEX.PENAL CODE ANN. § 19.04 (indicating that, pursuant to Texas Penal Code Section 6.03(c), a person acts recklessly when he is "aware of, but consciously disregards a substantial and unjustifiable risk" that the result will occur). The "reckless" conduct relied upon in support of the requested manslaughter offense must still be part of the conduct in the greater, charged offense--here murder. Our Court made that point in *Apilado v. State*, No. 08-16-00358-CR, 2018 WL 3629371 (Tex.App.--El Paso July 31, 2018, pet. ref'd) (not designated for publication).

In *Apilado*, the defendant shot and killed his father. He claimed he did so while sleepwalking. After being convicted of murder, he complained on appeal that the trial court erred in omitting a lesser included charge for manslaughter. He argued that the evidence supported

25

recklessness in that he was aware: (1) of his propensity to sleepwalk and act violently while sleepwalking, (2) he had not slept for four days before the shooting, and (3) he had obtained a rifle and kept it in his home after police had previously confiscated a pistol that Appellant had used to strike his father. 2018 WL 3629371, at *7. This Court concluded that evidence did not, however, support submission of the lesser included offense:

> Of [Apilado's] itemized evidence, only [his] possession of the rifle within the home constitutes conduct on his part. However, that conduct, even if deemed reckless, is not the same conduct that caused the victim's death. The victim's death was caused by [Apilado] shooting him in the head with the rifle. Consequently, [Apilado's] alleged reckless conduct (keeping a rifle in the home) is not the same as the conduct that caused his father's death (using a rifle to shoot his father in the head), nor was the alleged reckless conduct included within the facts necessary to prove the conduct and offense charged in the indictment, murder.

2018 WL 3629371, at *7; *see also Roy*, 509 S.W.3d at 319 ("But a defendant need not be aware at the moment the result occurs if he can show that he consciously disregarded the risk of the result and the result came from the same conduct.").

For much the same reason, we conclude the conduct that Appellant points to (having a gun in the vehicle) is too removed from the conduct that caused the death. Jorjorian died either because Nava or Appellant shot him. Appellant's argument under this point assumes that Nava pulled the trigger. But that conduct is distinct and different from how Nava might have come to have a gun in his possession. And given the jury was charged on the law of parties--where Appellant can be liable for the conduct of Nava--the critical inquiry would be Nava's *mens rea* at the time of the shooting. And there is no evidence that Nava acted recklessly when he shot Jorjorian. For instance, Appellant did not explain that Nava pointed a gun at Jorjorian and it went off accidentally during a struggle. *See Ross v. State*, 861 S.W.2d 870, 875 (Tex.Crim.App. 1992) (en banc) (holding that a defendant who held a loaded, cocked gun at a victim's head when it accidentally discharged acted recklessly). Rather, the evidence pointed to the use of a deadly weapon fired at

26

close range which presumes an intent to kill. See *Apilado*, 2018 WL 3629371, at *4 (collecting cases). A statement overheard at the scene ("I'm going to shoot you n____! I'm going to shoot you") supports that presumption. Measured by the act that caused the death, the murder was intentional and not the result of recklessness.

### C. There was no Evidence of Recklessness in Storing the Gun

Moreover, we also conclude that there was no evidence presented at trial that Appellant acted recklessly in allowing Nava to obtain the gun. There was no evidence of where and how Appellant stored the weapon in the vehicle. That is, there was no evidence as to whether he had it safely stowed in the glove compartment, or in open view to his passengers. In fact, Appellant did not state during the interview that he kept a firearm in his vehicle. Nor is there any detail about how Nava came to know of or obtain the gun. Appellant never told law enforcement how Nava came to be in possession of the firearm that shot Jorjorian, other than to respond "yes," when Detective Garcia questioned, "But it's your gun."[8] Without any of these critical details, there is no inference of recklessness that a jury could have gleaned from only the fact that Nava had the gun in his possession, and apparently returned it to Appellant after the shooting.

We thus conclude that the trial court did not err by denying Appellant's request for a manslaughter instruction, and we overrule the issue.

---

[8] For instance, Nava could have taken the firearm from Appellant's residence earlier in the day--or any point earlier in time--and had the firearm in his pants' pocket the entire day of the murder. Appellant told Detective Garcia that Nava was a "little brother" and the two were "really close," so a jury could infer that Nava spent time at Appellant's home and could have accessed the weapon there.

27

## VI. NO ERROR BY DENYING REQUEST FOR CORPUS DELICTI INSTRUCTION

In his final issue, Appellant maintains that the trial court should have provided a corpus delicti instruction because the State presented no evidence of a robbery aside from his interview.[9] The State responds that Appellant has not shown that the trial court erred by denying his request, because some independent evidence tended to show that a robbery was committed. We agree and conclude that Appellant has not shown that he is entitled to relief.

### A. Corpus Delicti

The corpus delicti rule requires some evidence aside from an accused's confession, considered in the light most favorable to the jury's verdict, showing that a crime actually occurred. *See Salazar v. State*, 86 S.W.3d 640, 645 (Tex.Crim.App. 2002); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim.App. 1997) (en banc). Historically, the corpus delicti rule guarded against the spectacle created when a murder victim suddenly reappears after a self-confessed-murder-defendant was convicted and executed. *Salazar*, 86 S.W.3d at 644, *citing* ROLLIN M. PERKINS & RONALD M. BOYCE, CRIMINAL LAW 142-150 (3d ed. 1982). In our current era, the rule protects mentally infirm individuals who confess to an imaginary crime and people who give an extrajudicial confession because of official coercion. *See Bible v. State*, 162 S.W.3d 234, 247 (Tex.Crim.App. 2005).

---

[9] After the trial court entered judgment, Appellant filed the following proposed corpus delicti jury instruction:

> Additionally, a person cannot be convicted of a crime based only on his uncorroborated, out-of-court statements. You may only rely on the defendant's out-of-court statements if you find there is other evidence which, considered alone or with these statements, shows that the crime charged occurred. This other evidence does not have to show that the defendant was the one who committed the offense. But if you do not believe that any evidence other than the defendant's out-of-court statements shows that a capital murder, murder, or robbery occurred, you will find the defendant "not guilty."

The corpus delecti rule was not intended to ensure that confessions are corroborated in specific detail or to ensure that the defendant does not falsely confess to a crime that actually occurred. *Salazar*, 86 S.W.3d at 644 (noting that other constitutional rules and statutes concerning the voluntariness of a confession guard against an innocent person confessing to a crime he did not commit), *citing Self v. State*, 513 S.W.2d 832, 836-37 (Tex.Crim.App. 1974). "This other evidence need not be sufficient by itself to prove the offense: 'all that is required is that there be some evidence which renders the commission of the offense more probable than it would be without the evidence.'" *Rocha v. State*, 16 S.W.3d 1, 4 (Tex.Crim.App. 2000), *quoting Williams v. State*, 958 S.W.2d 186, 190 (Tex.Crim.App. 1997) (en banc).

A person commits robbery when, in the course of committing theft and "with intent to obtain or maintain control of the property," he "(1) intentionally, knowingly, or recklessly causes bodily injury to another, or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX.PENAL CODE ANN. § 29.02(a). A person commits theft when he "unlawfully appropriates property with the intent to deprive the owner of property." TEX.PENAL CODE ANN. § 31.03(a). Appellant's claim here is that there was no corroborating evidence of a robbery (a component of the felony murder charge), and thus the jury should have been instructed on the corpus delecti rule which would have allowed it to not consider the confession.

## B. Jury Charge Error

A reviewing court's first duty in analyzing a jury-charge issue is to determine whether error exists. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005) (en banc). If the court finds error, it analyzes the error for harm. *See id.* Jury charge error requires reversal when the defendant properly objected to the charge and the error resulted in "some harm" to his rights. *See id.*, *citing*

29

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985) (en banc) (op. on reh'g). When a defendant did not object to a charge, reversal is not warranted unless the record shows egregious harm to the defendant. *See Ngo*, 175 S.W.3d at 743, *citing Almanza*, 686 S.W.2d at 171.

Although Appellant objected to the exclusion of this instruction, we need not reach the issue of harm, because we conclude the trial court did not err in refusing the instruction. *See Baldree v. State*, 784 S.W.2d 676, 686 (Tex.Crim.App. 1989) (en banc) (indicating that "a trial judge need not instruct the jury on corroboration when the corpus delicti is established by the evidence"). As explained below, independent evidence apart from Appellant's interview renders the corpus delicti of robbery more probable than it would be without the evidence. *Rocha*, 16 S.W.3d at 4.

## C. Is Corroboration of the Murder Enough?

Appellant's argument focuses on whether the record contains any corroboration of the robbery component of the felony murder charge, agreeing that there is certainly corroborating evidence of a murder. The State responds that in a murder case, it need only corroborate a murder, here by evidence that Jorjorian died from a gunshot wound to the chest. *See Nisbett v. State*, 552 S.W.3d 244, 264 (Tex.Crim.App. 2018) ("[T]he corpus delicti of murder is established if the evidence shows the death of a human being caused by the criminal act of another, and the State is not required to produce and identify the body or remains of the decedent.") (internal quotes omitted). The question of whether the evidence had to corroborate the murder or both the robbery and murder is potentially answered by *Miller v. State*, 457 S.W.3d 919, 927 (Tex.Crim.App. 2015). In *Miller*, the defendant confessed to four instances of aggravated sexual assault, but the State had corroborating evidence only for one of the counts. The court of appeals reversed guilty verdicts on three counts, based on the corpus delicti rule. The Texas Court of Criminal Appeals

refused the State's argument to drop the corpus delicti rule altogether, but it did create an exception --"Texas criminal law does recognize a closely related crimes exception to the corpus delicti rule in cases with an extrajudicial confession, and it is implicated when the temporal connection between the offenses confessed to is sufficiently close that introduction of the confession does not violate the purposes of the corpus delicti rule." *Id.* at 929.

The robbery and murder were closely related in time and circumstance. But we need not decide if that exception applies here, however, because we conclude there is sufficient corroborating evidence of the robbery, if corroboration of that aspect of the crime is required.

### D. Independent Evidence of Robbery

The record contains evidence corroborating Appellant's statement that he and Nava were intending to steal Jorjorian's drugs, and that in the process Jorjorian was killed. Nava's text messages corroborated that there was to be a drug sale transaction in the park that night. Hours before he was murdered, Jorjorian and Nava exchanged text messages concerning Nava purchasing two syringes of liquified THC, or wax, from Jorjorian. But the evidence suggested something more than a simple purchase transaction. A witness heard a car pull up and yelling from within the vehicle. The witness next heard a car door open and a person shout, "I'm going to shoot you n____! I'm going to shoot you." The car then drove away. Another witness saw a small SUV with an occupant and a young driver who proceeded oddly fast and failed to stop at a stop sign in the neighborhood. Witnesses found Jorjorian lying on the pavement, shot in the chest, with two syringes next to him filled with greenish liquid.

The record therefore contained evidence of an intended drug transaction that went awry. The circumstances of it going wrong were consistent with a robbery. Both Appellant and Jorjorian had body marks consistent with a fight. Autopsy photographs detailed abrasions and bruising to

31

Appellant's left earlobe, bruising to his right hand and a cut to his finger. Although evidence may have supported other explanations for the injuries to Jorjorian's face and extremities, the jury was free to believe and give weight to the testimony that they were caused by assault. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim.App. 1986) (en banc). Appellant gave inconsistent statements as to how he suffered his injuries. And the injuries to both Appellant and Jorjorian would be consistent with a forceful attempt to steal the drugs. The record also contains corroboration of the gun that Appellant described as being used by Nava. Use of the gun itself is consistent with an attempt to commit robbery instead of a simple drug-sale transaction.

A defendant does not have to complete the theft to be guilty of robbery. In *Wolfe v. State*, a defendant convicted of capital murder argued that the evidence was insufficient to support his underlying felony of robbery when the victim was found with a coin in her purse and coins on the floor of her home. *See* 917 S.W.2d 270, 275 (Tex.Crim.App. 1996). Finding the evidence sufficient, the Court of Criminal Appeals noted that "[p]roof of a completed theft is not required to establish a robbery," and the intent to steal may be inferred from circumstantial evidence. *Id.*, *citing Demouchette v. State*, 731 S.W.2d 75, 78 (Tex.Crim.App. 1986) (en banc). Moreover, the court concluded that a rational jury could believe that appellant's cut fingers, blood on an unlatched coin purse, and scattered coins on the floor met the threshold of sufficient evidence to support robbery underlying capital murder. *See Wolfe*, 917 S.W.3d at 275 (noting that intent can be inferred from circumstantial evidence). As in *Wolfe*, the corpus delicti for the robbery of Jorjorian could be established by the cumulative force of the direct and circumstantial evidence when viewed separate and apart from Appellant's statement to law enforcement. *See id.; see also Gribble v. State*, 808 S.W.2d 65, 72 (Tex.Crim.App. 1990) (en banc) (indicating that, while there was little evidence apart from Appellant's confession to suggest the victim was kidnapped, corpus delicti

32

was satisfied because the record was not "utterly devoid of evidence" to the effect). As such, the trial court was not required to give the instruction, and we overrule Issue Four.

## VII. CONCLUSION

Having overruled Appellant's issues, we affirm the trial court's judgment adjudicating guilt.

JEFF ALLEY, Chief Justice

December 15, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)